FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

97 OCT 27 PM 3:16

U.S. DISTRICT COURT
N.D. OF ALABAMA

KAREN DENISE WHITE,                    )
                                       )
        Plaintiff,                     )
                                       )      CIVIL ACTION NO.
        vs.                            )
                                       )      CV-96-AR-1396-S
INTERGRAPH CORPORATION,                )
                                       )
        Defendant.                     )

**ENTERED**

OCT 27 1997

## MEMORANDUM OPINION

The court has before it the motion of defendant, Intergraph

Corporation ("Intergraph"), for summary judgment in the above-

styled cause.  Plaintiff, Karen Denise White ("White"), a former

Intergraph employee alleges that defendant violated the Civil

Rights Act of 1964, *as amended*, the Civil Rights Act of 1991, 42

U.S.C. §§ 2000e *et. seq.* ("Title VII"), and the Civil Rights Act

of 1866, 42 U.S.C. § 1981 ("§ 1981"), by demoting her because of

her race, by subjecting her to hostile environment racial

harassment, and by constructively discharging her from her

employment.  For the following reasons, the court determines that

no genuine issue of material fact exists with respect to said

claims and, therefore, it concludes that Intergraph is entitled

to judgment as a matter of law.

41

## I. *Undisputed Material Facts*

White, a black female, began working for Intergraph as an Engineering Technician I on May 2, 1994.  Intergraph slated her to work in its desktop workstation department ("DTWS").  In DTWS, employees assemble, test, and, if necessary, repair the computer workstations that Intergraph manufactures.

DTWS is divided into three areas — the initial test area ("Initial Test"); the final test area ("Final Test"); and, the repair area ("Repair").  As a matter of company policy, Intergraph initially assigns all new Engineering Technicians who work in DTWS to Initial Test.  After starting at Intergraph, White worked in Initial Test for six to eight weeks.  At the end of this period, the company reassigned her to Repair.  Throughout her employment at Intergraph, Chris Ray ("Ray") served as White's immediate supervisor.  During this same period, John McMullen ("McMullen") was Ray's immediate supervisor.

White received a six-month performance evaluation from Ray on November 4, 1994.  On her evaluation, White received an overall rating of "adequate."  (Def. Exh. 7C).  This is the second lowest rating that Intergraph employees can receive.  Ray emphasized that White needed to work toward making fewer mistakes.  Nevertheless, he concluded that "Karen's overall

2

performance [had] met expectations of an Engineering Technician
I." (Id.).

On December 2, 1994, White received a written reprimand for
"excessive errors being made when repairing bases." (Def. Exh.
7D). She received a second reprimand for "errors during routine
repairs" on March 27, 1995. (Def. Exh. 7E). As a result of this
second reprimand, Ray reassigned White to Initial Test.
According to Ray and a senior company manager, Tim Cooper
("Cooper"), White was reassigned so that she could receive
retraining in essential repair skills. (Ray Depo. at 97-99;
Cooper Depo. at 41). About six weeks after her reassignment,
White received a pay increase of more than three percent. (Def.
Exh. 7F).

On April 3, 1995, White gave McMullen a six-page memorandum
that outlined a series of complaints that White had with Ray and
her general work environment. (Def. Exh. 7G). That same day,
McMullen instructed Ray to respond to White's memorandum, and he
did so. (Def. Exh. 7H). It seems that in the course of drafting
his response, Ray left White's memorandum unattended at his desk
— an area open to all DTWS employees. As a result, several DTWS
employees apparently had the chance to see White's memorandum.

On April 7, 1995, White, Ray, McMullen, Cooper, and a

3

representative of the company's human resources department,
Marilyn Parker ("Parker"), met to discuss White's complaints.
(Def. Exh. 7I).  The consensus developed at the meeting was that
White and Ray needed to improve their lines of communication.
White did not express any concerns about racial discrimination
either at this meeting or in her memorandum to McMullen.  (Pl.
Depo. at 173-74).

White received her one-year performance evaluation on May
11, 1995.  (Def. Exh. 7K).  Once again, she received an overall
performance rating of "adequate."  Not soon after her one-year
evaluation, White requested a voluntary transfer to another
department.  Intergraph policy requires an employee to receive at
least a "solid" rating on his or her most recent performance
evaluation before he or she can qualify for a voluntary transfer.
As a result of this policy, White did not receive the requested
transfer.

On May 17, 1995, White discovered a note on the seat of her
car.  Apparently, the note had been left there while the car was
parked in the Intergraph parking lot.  The note read "Niger [sic]
Bitch."  White did not report this incident at the time.  While
she was getting gas after work on May 19, 1995, White discovered
a piece of tape on her car.  The word "Niger" [sic] was written

4

on the piece of tape.

White told Ray about the two notes on May 22, 1997.  Ray immediately contacted the company's security and human resources departments.  Officer Walter Smith ("Smith") examined White's car for damage and took an incident report.  (Def. Exh. 7L).  Ray also contacted Parker.  Parker interviewed White, Ray, and Cooper about the incident.  Neither White, Ray, nor Cooper could suggest a possible author of the notes.  In fact, White stated that she had "no enemies" in DTWS and that she got along well with her coworkers.  (Id.).  Ray and Cooper both confirmed that White enjoyed good relations with other DTWS employees.  (Parker Depo. at 123).  Parker did not interview other DTWS employees concerning the incident.  Finally, Parker attempted to see if the notes had been written on Intergraph paper or with its equipment, and she told White to report any further incidents.

The day after White reported the two notes, she informed Ray that she wanted to participate in the company's ongoing voluntary layoff.  Ray passed her request on to senior management.  The company granted White's request, and her last day at Intergraph was May 23, 1995.  Pursuant to the company's severance pay policy, Intergraph paid White through June 6, 1995.  White later filed a discrimination charge with the Equal Employment

5

Opportunity Commission. That agency issued her a right-to-sue

letter, and this lawsuit followed.

## II. *Summary Judgment Standard*

Rule 56 states in pertinent part:

> The judgment sought shall be rendered forthwith if the
> pleadings, depositions, answers to interrogatories, and
> admissions on file, together with affidavits, if any, show
> that there is no genuine issue as to any material fact and
> that the moving party is entitled to a judgment as a matter
> of law.

Fed.R.Civ.P. 56(c). The Eleventh Circuit also has observed that

"[s]ummary judgment is appropriate where there exists no genuine

issue of material fact and the movant is entitled to judgment as

a matter of law." Turnes v. AmSouth Bank, N.A., 36 F.3d 1057,

1061 (11th Cir. 1994). Intergraph has invoked Rule 56.

## III. *Discussion*

### A. White's Demotion Claim

White alleges that she experienced disparate treatment in

workplace discipline when her supervisor, Chris Ray, reassigned

her to the Initial Test area of the DTWS department for

committing "excessive errors." More specifically, she claims

that her reassignment constituted a demotion and that Ray did not

6

take similar action when disciplining white employees who also
made mistakes.  Although it is more precise to describe this
claim as one for disparate treatment in workplace discipline,
both parties refer to it as White's "demotion" claim.  To
minimize confusion, the court will do the same.

The United States Supreme Court first articulated the *prima
facie* case for disparate treatment in employment settings in
<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817
(1973).  The Court later refined this standard in <u>Texas Dept. of
Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S.Ct. 1089
(1981).  Over the years, courts have adapted the <u>McDonnell
Douglas</u>-<u>Burdine</u> model to analyze varying types of employment
discrimination claims.  For example, in order to make out a *prima
facie* case for disparate treatment in workplace discipline, an
employee must demonstrate: (1) that she is a member of the class
protected by Title VII and § 1981; (2) that she was qualified for
her position; (3) that she experienced an adverse employment
action — e.g., a demotion; and (4) that she experienced
differential application of work or disciplinary rules.[1]

---

[1]      The *prima facie* case under Title VII and § 1981 is essentially the
same.  *See* <u>Grooms v. Wiregrass Elec. Co-op., Inc.</u>, 883 F.Supp. 643, 647 n.3
(M.D.Ala. 1993) (explaining that "the legal elements of a § 1981 and Title VII
claim predicated on disparate treatment are identical").

*Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1314 (11th Cir. 1994).  If White establishes a *prima facie* case for disparate treatment in workplace discipline, then the burden of production shifts to Intergraph to establish evidence of a legitimate, nondiscriminatory reason that explains why it took the employment action that it did.  *See* id. at 1313.  Finally, if Intergraph meets this exceedingly light burden, then the burden shifts to White to show that the reason given by Intergraph is, in fact, a pretext for discrimination.  *See* id. at 1313-14.

Intergraph attempts to undermine White's *prima facie* case in two ways.[2]  First, Intergraph argues that White's "reassignment" from Repair to Initial Test did not constitute a demotion and, therefore, that she experienced no adverse employment action.  As support for this position, Intergraph points to the fact that White's reassignment was to another area within the same department, the fact that she retained the same job description, and the fact that she received a pay increase following the move.

Despite Intergraph's protestations to the contrary, it is

---

[2]    In her brief, White asserts that Intergraph does not challenge her *prima facie* case of disparate treatment.  This assertion is unfounded. Intergraph makes an obvious attack on White's *prima facie* case when it argues that, for a variety of reasons, moving her from Repair back to Initial Test did not constitute a demotion.  Consequently, to survive summary judgment, White must establish her *prima facie* case.

8

clear, however, that White's reassignment effectively resulted in a demotion. It is well established that, where an employee can show after reassignment: (1) that she received less pay; (2) that she had less responsibility; or (3) that she was required to utilize less skill, a workplace reassignment constitutes a demotion, such as will support a claim for disparate treatment. *See* Singleton v. Jackson Mun. Separate Sch. Dist., 419 F.2d 1211, 1218 (5th Cir. 1969), *rev'd in part on other grounds sub nom.*, Carter v. West Feliciana Parish School Bd., 396 U.S. 226, 90 S.Ct. 467 (1969). The record clearly reveals that the work in Initial Test was "less challenging" than the work in Repair. (Ray Depo. at 97). Intergraph, in fact, concedes this point. (Def. Brf. at 14). In the court's view, there is no material difference in describing one position as less challenging than another and saying that the second position involves less responsibility and skill. Therefore, in light of Intergraph's concession, the court concludes that White's reassignment constituted a demotion and that Intergraph's argument on this point is not well taken.

Second, Intergraph argues that White has not shown that she experienced differential application of work or disciplinary rules. To prevail on this point, White must show by a

9

preponderance of the evidence either: (1) that she did not
violate the work rule at issue; or (2) that she "engaged in
misconduct similar to that of a person outside the protected
class, and that the disciplinary measures enforced against [her]
were more severe than those enforced against the other persons
who engaged in similar misconduct." Jones v. Gerwens, 874 F.2d
1534, 1538, 1540 (11th Cir. 1989); Dudley v. Wal-Mart Stores,
Inc., 931 F.Supp. 773, 787 (M.D.Ala. 1996). White asserts that
other employees within her department made errors but were not
"counseled, reprimanded, or demoted." (Pl. Brf. at 3). As
support for this assertion, she offers, *inter alia*, her own
deposition testimony in which she says that she witnessed other
employees go undisciplined for making errors similar to her own.
Although it is a close call, the court reluctantly concludes that
White's deposition testimony provides sufficient evidence to make
a *prima facie* case on her demotion claim.[3]

However, by articulating a legitimate, nondiscriminatory
reason for demoting White to Initial Test, Intergraph has

---

[3]    In opposition to White's contention that other employees were not
disciplined for making errors, Intergraph offers copies of written warnings
that were given to white employees regarding the quality of their work.  (Def.
Exh. 7T).  In each instance, however, the warning is dated after May 23, 1995
— White's last day of employment.  Consequently, these warnings are not
relevant to this case and cannot be considered by the court.

successfully rebutted her *prima facie* case.   The record clearly

indicates that the company demoted White to Initial Test to

provide her with retraining in essential repair skills.   (Ray

Depo. at 97-99; Cooper Depo. at 41).   As discussed above, the

burden now shifts to White to show that this reason is merely a

pretext for race discrimination.

To establish pretext, White "has the opportunity to come

forward with evidence, including the previously produced evidence

establishing the prima facie case, sufficient to permit a

reasonable factfinder to conclude that the reasons given by the

employer were not the real reasons for the adverse employment

decision."   <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1528

(11th Cir. 1997).   White does not, however, put forward any

evidence of pretext in support of her demotion claim.[4]   Moreover,

---

[4]       White's reliance on <u>Malhotra v. Cotter & Co.</u>, 885 F.2d 1305 (7th
Cir. 1989), may explain, in part, her failure to submit evidence of pretext.
In <u>Malhotra</u>, the employer made a motion for summary judgment on the basis of
procedural defects.   The district court, however, granted summary judgment
because the employee had failed to make out a *prima facie* case of
discrimination.   On appeal, the Seventh Circuit remanded the case and
explained that "[w]hen a party moves for summary judgment on ground A, his
opponent is not required to respond on ground B — a ground the movant might
have presented but did not."   <u>Id</u>. at 1310.   Apparently, White misreads
<u>Malhotra</u> to mean that, because Intergraph did not move for summary judgment
specifically on the ground that White cannot show pretext, she need not do so.
Obviously, where "ground A" and "ground B" are very distinct, the conclusion
reached by the Seventh Circuit is correct.   In the instant case, however,
there is no "ground B," only a "ground A."   Intergraph seeks summary judgment
by claiming that White cannot show disparate treatment.   White's burden to
demonstrate pretext is not distinct from that "ground."   Rather, it is a
central aspect of her defense, and nothing in <u>Malhotra</u> relieves her of that
burden.

11

given her concession that Ray had complete discretion in deciding
whether or not to discipline DTWS employees for making mistakes,
the evidence offered in support of her *prima facie* case does not
support the contention that Intergraph demoted her for a reasons
other than retraining. (Pl. Brf. at 3). Thus, under the <u>Combs</u>
standard, the court concludes that White has not shown that
Intergraph's articulated reason is "unworthy of credence." The
employer is, therefore, entitled to summary judgment on
plaintiff's demotion claim.

### B. White's Hostile Environment Claim.

In the week prior to White's resignation, two racially
derogatory notes were left in and on her car while it was parked
in the Intergraph parking lot. She contends that these notes
constitute hostile environment racial harassment. As the
Eleventh Circuit recently explained:

> "Hostile environment [racial] harassment occurs when as
> employer's conduct 'has the purpose or effect of
> unreasonably interfering with an individuals's work
> performance or creating an intimidating, hostile, or
> offensive environment.'" (Citations omitted). Title VII is
> violated "[w]hen the workplace is permeated with
> 'discriminatory intimidation, ridicule, and insult' that is
> 'sufficiently severe or pervasive to alter the conditions of
> the victim's employment.'" (Citations omitted). The
> harassing conduct must create <u>both</u> an objectively hostile
> environment — one "that a reasonable person would find
> hostile or abusive" — and a subjectively hostile or abusive
> environment — one that "the victim subjectively perceive[s]
> . . . to be abusive."

12

Fleming v. Boeing Co., 1997 WL 450156 *3-4 (11th Cir. 1997)
(emphasis supplied).  White also contends that Intergraph has
direct liability for her alleged harassment.  "Direct liability
lies when the employer "knew, or upon reasonable inquiry should
have known, of the harassment and failed to take immediate and
appropriate corrective action."  Id. at *5 (quoting Faragher v.
City of Boca Raton, 111 F.3d 1530, 1535 (11th Cir. 1997); see
also Reynolds v. CSX Transportation, Inc., 115 F.3d 860, 866-67
(11th Cir. 1997) (discussing employer liability for hostile
environment racial harassment under Title VII and § 1981).

Intergraph argues that White's claim for hostile environment
racial harassment fails because the company responded to the
discovery of these two notes with prompt remedial action.
Intergraph's argument is well taken.  The record reveals that
Intergraph undertook a reasonable investigation of the two notes
on the same day that White reported them to her supervisor.  The
security department examined her car for damage and took an
incident report.  In addition, the human resources department
interviewed White, Ray, Cooper in an effort to gather all the
details surrounding the incidents and to identify the author of
the notes.  Finally, human resources tried to determine if the
notes had been written on Intergraph paper or with its equipment.

13

Although the investigation did not uncover who left the notes, this fact does not result, as White suggests, in the conclusion that Intergraph failed in its legal obligation to respond to the alleged harassment. The Eleventh Circuit defines remedial action to mean "action '"reasonably likely to prevent the misconduct from recurring."'" Reynolds, 115 F.3d at 867. Considering that White could not identify any suspects who might have authored and/or delivered the notes, that she admitted that she got along well with her coworkers, and that she obviated Intergraph's responsibility to investigate the matter further by resigning the day after she reported the notes, the court concludes that the steps Intergraph took constituted such action. Therefore, the company is entitled to judgment as a matter of law on White's hostile environment racial harassment claim.   In reaching this conclusion, the court cannot help but wonder how a large employer with many employees can be expected to head off all anonymous, ugly notes between employees.

**C. White's Constructive Discharge Claim.**

White alleges that the racially hostile environment she confronted at Intergraph and the company's racially discriminatory practices resulted in her constructive discharge on May 23, 1995. According to the Eleventh Circuit:

14

> The law of this circuit with respect to constructive
> discharge is well established.  To show constructive
> discharge, the employee must prove that [her] working
> conditions were so difficult or unpleasant that a reasonable
> person would have felt compelled to resign.  (Citations
> omitted).  <u>Before finding a constructive discharge, this
> court has traditionally required a high degree of
> deterioration in an employee's working conditions,
> approaching the level of "intolerable."</u>

<u>Hill v. Winn-Dixie Stores, Inc.</u>, 934 F.2d 1518, 1527 (11th Cir.

1991) (emphasis supplied); *see also* <u>Morgan v. Ford</u>, 6 F.3d 750,

755 (11th Cir. 1993) (describing constructive discharge

standard).  In support of her claim, White, in her brief,

describes her working conditions as follows:

> [T]he plaintiff was treated differently than were similarly
> situated whites in regards to reprimands and discipline; the
> plaintiff was demoted; the plaintiff wrote a complaint
> letter to McMullen which was supposed to be confidential but
> other employees read the letter; . . . despite following
> company procedure, White was given a lower score on her
> evaluation because she wrote the complaint letter; a note
> stating "Niger [sic] Bitch" was left on her car while parked
> in the Intergraph parking lot; a second note stating "Niger"
> [sic] was taped to her car while parked in the Intergraph
> parking lot; White was told by security officer Smith that
> he would not be investigating the matter because it was not
> his area of responsibility and he was not trained to do such
> an investigation; and White was informed by Parker that
> Intergraph did not know whether the incident occurred on
> Intergraph property or by an Intergraph employee and that
> there was nothing which could be done.  As a result of the
> above, the plaintiff testified she felt upset, scared,
> frightened, and began to fear for her safety.[5]

(Pl. Brf. at 32) (alterations in original).  When applying the

---

[5]   The ellipsis illustrates the omission of hearsay testimony that
the court cannot not consider in evaluating White's constructive discharge
claim.

Hill standard to White's description of her working conditions,
it is clear that her claim of constructive discharge fails for
two reasons. First, with the exception of the two racially
derogatory notes, White has failed to demonstrate that she was
subjected to any of the conditions described above because of her
race. This is a fundamental requirement of such a claim. See
Morgan, 6 F.3d at 755 (explaining that employer commits
constructive discharge in violation of Title VII "[w]hen an
employee involuntarily resigns in order to escape intolerable and
illegal employment requirements to which he or she is subjected
because of race, color, religion, sex, or national origin")
(emphasis supplied). Having made no such showing, White may not
rely on the alleged conditions to make a claim of constructive
discharge. Second, although the two notes are of an obvious
racial character, it is impossible for the court to say that the
notes, standing alone, created an intolerable working
environment. Therefore, the court concludes that Intergraph is
entitled to summary judgment on this claim. In reaching this
conclusion, the court expresses its interest in the fact that,
despite her obvious knowledge of the Eleventh Circuit standard,
White never once uses the word "intolerable" to describe her
working conditions. Although the use of that word is not a

16

prerequisite for a successful constructive discharge claim, in the court's view, the decision not to use it here betrays White's recognition of the difficulty that a reasonable person would have in drawing such a conclusion in her case from the facts as presented.

### IV. *Conclusion*

The court will enter a separate and appropriate order reflecting the conclusions discussed in this memorandum opinion.

DONE this **27** day of October, 1997.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

17